***ELIZABETH J. FOLEY***
NEVADA BAR 1509
ELIZABETH J. FOLEY LAWYER, LTD.
601 So. Rancho Drive, Suite A-1
Las Vegas, Nevada  89106
Phone: (702) 363-2323
Fax: (702)380-4035
Email: Efoleylawyer@gmail.com
*Attorney for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| MAX RUHLMANN and ERIC SAMBOLD, <br><br> Plaintiffs, <br><br> v. <br><br> GLENN RUDOLFSKY, individually and DBA HOUSE OF DREAMS KAUAI and HOUSE OF DREAMS HAWAII; KIM D. RUDOLFSKY, AKA KIMI DAPOLITO, individually; and DBA HOUSE OF DREAMS KAUAI and HOUSE OF DREAMS HAWAII <br><br> Defendants. | CASE NO.: 2:14-cv-00879-RFB-NJK <br><br> DECLARATION OF JAMES "MAX" RUHLMANN IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT FOR LACK OF PERSONAL JURISDICTION AND *FORUM NON CONVENIENS* |

STATE OF NEVADA    )
                                ) SS:
COUNTY OF CLARK  )

I, James "Max" Ruhlmann, declare as follows:

1. I am a plaintiff in the above-referenced case, pending in the United States District Court for the District of Nevada.

2. I have been a citizen and resident of Nevada since 1995. I intend to remain a citizen and resident of Nevada in the future.

3. I first emailed the defendant Glenn Rudolfsky in 2010 about a vacation rental. I understood Mr. Rudolfsky to be a New York commodities broker who owned a rental property on the Island of Kauai in Hawaii called "House of Dreams Kauai." I found the email address for House

of Dreams Kauai on the internet using my computer at my residence in Las Vegas. The House of Dreams Kauai internet ad lists an office in Nassau County, New York with a 516 area code and a cellular phone with an 808 Hawaii area code.

4. From 2010 through July 21, 2014, I have had a great number of contacts with Mr. Rudolfsky involving rental properties and vacation rental business opportunities.

5. Defendant Glenn Rudolfsky has owned real estate in Nevada since 2000.

6. On September 26, 2011, Mr. Rudolfsky sent me his first formal solicitation concerning the short sale bid he had made for what became known as the "Ke Aloha" property, which is the subject of this litigation. "I entered a $1,025,000 [bid] for a 5 acre Kalihiwai Ridge Estate. It sold in 2011 for 2.4 million and I believe I am close to being accepted. With furnishings and some necessary repairs to the decking I believe we would come in at 1.1 or less." It was clearly presented as an investment-income producing property. "In my opinion this home could produce a solid 10-15% return after management fees and all expenses. If my bid is approved I am looking for investment in 100K blocks. I am willing to sell up to 50% of the property. Read the PDF enclosed." The enclosed "PDF" was a listing for "Namahana Plantation MLS #248049," a five page memorandum describing in detail a different investment property, including a one page discussion of the income potential – a projected "12%-13% return on investment," calculated to induce me to invest in the Ke Aloha property Mr. Rudolfsky had recently bid on a property that was the subject of a short sale. I forwarded the information to Eric Sambold, the other plaintiff in this litigation, for his consideration. (Appendix pages RS19 to RS25). Mr. Sambold and I both understood that Mr. Rudolfsky intended this as an investment vehicle/opportunity under which we would acquire equity in the business.

7. On September 30, 2011, Mr. Rudolfsky sent me a follow up email stating that the previous day his $1,025,000 bid was accepted by the owner of the Ke Aloha property. He said "At this time I have 500K in cash that I want to invest. Financing the balance would be a challenge in the current mortgage environment. I would much prefer to have partners in this great and fun

ELIZABETH J. FOLEY
LAWYER, LTD.
601 S. Rancho Drive, Suite A-1
Quail Park II
Las Vegas Nevada 89106
Phone: (702) 363-2323 • Fax: (702) 380-4035

opportunity rather than go it alone. Because I have so much at stake, I will work this home tirelessly to make it a success. Please give it some consideration and let me know if this is something you would like to be involved in." He concluded by saying, "I am very excited about this home for myself and even more so for about the prospect of making money for others." (Appendix page RS26).

8. On October 6, 2011, Mr. Rudolfsky sent me an email asking whether or not I would be interested in investing in the Ke Aloha property, saying it was only because he would not qualify for financing, that as a commodity trader banks regarded his income as speculative. (Appendix page RS27).

9. On or about October 9, 2011, I had a telephone conversation with Mr. Rudolfsky concerning the Ke Aloha investment opportunity. (Appendix page RS27).

10. On December 20, 2011, Mr. Rudolfsky notified me by email that his bid for the property of $1,025,000 was accepted "by the lien holder for Namahana Plantation. (Appendix pages RS28 to RS30). He gave a detailed assessment of the property based on his visit two weeks before. The assessment was a sales document intended to interest me in investing in the business. It discussed (1) "The house," (2) "The Property," (3) "The Guest House," (4) "Down the road," (5) "Funding," (6) "Lastly, Projected Income." Under "Funding" Mr. Rudolfsky stated that he had "500K-550K of my own cash to invest" and that after improvements it would cost "under 1.1 million." Mr. Rudolfsky stated that he planned to make up any shortfall by borrowing against his New York home. Under "Projected Income" he indicated in the "worst case scenario" we would realize "about 140K gross," prediction, "If I cannot reach 200K by the second year in gross revenue, I would be very surprised." He also predicted that, "By year 3 with those kinds of revenues we can think about flipping the property at a substantial profit." Mr. Rudolfsky concluded by saying he would consider coming to Vegas to meet with me so I could get to know him as well. (Appendix pages RS28 to RS30).

11. Subsequently, I informed Mr. Rudolfsky that I intended to involve Plaintiff Eric

Sambold as a partner in the deal.

12. On December 26, 2011, Mr. Rudolfsky sent me an email saying he had connected with Harvey L. Cohen, Esq., the local attorney handling the Namahana Transaction, and that the current owner had given the attorney permission to "represent our interests with respect to the continuation of the TVR (Transient Vacation Rental) permit process." Mr. Rudolfsky also said, "I would love to do this deal for all cash and you mentioned having a TVR might encourage further investment. I want to come to Vegas the weekend of January 5th and meet you and your partner ... Please let me know if Eric would be willing to come in that weekend." (Appendix pages RS31 to RS32). The Eric he referred to was the Plaintiff Eric Sambold.

13. On or about January 6-7, 2012, Mr. Sambold and I met in Las Vegas with Mr. Rudolfsky and his wife, Kim. At that time, the four of us agreed that Mr. Sambold and I would put up half the money for the Ke Aloha property and Mr. Rudolfsky and his wife would put up the other half. It was clearly understood that Mr. Sambold expected the deal to be structured in the form of an investment partnership. However, in order to protect our investment prior to the property being transferred to whatever investment vehicle was to be decided upon, it was contemplated that the transfer of the funds would initially be secured by a standard form of security instrument. From that meeting onward, Mr. Rudolfsky clearly understood that Mr. Sambold and I intended to be partners in the Ke Aloha investment project. At no time did Mr. Sambold or I hold ourselves out to Mr. Rudolfsky as being in the mortgage lending business. The record is clear that Mr. Rudolfsky solicited our participation in the Ke Aloha deal as potential investors rather than lenders and that we invested in the deal based on our understanding that once the closing took place we would become 50% owners in the vacation rental business.

14. On January 27, 2011, Mr. Rudolfsky sent an email to Mr. Sambold and me regarding his inability to have any other names on the deed at closing besides himself and his wife, Kim. "Because it is a short sale they will not allow any names other than Kim and I who made the bid on the deed at closing. For a small fee of $230 we can do a quitclaim at the closing transferring title to

- 4 -

1  Eric . . . Eric, then you can do the financing and when it comes through, Kim, Max and myself can
2  be reimbursed the appropriate funds. The same day, Mr. Sambold sent an email to Mr. Rudolfsky
3  saying, "I would not feel comfortable providing any shortfall as I have no security interest in the
4  property." (Appendix pages RS33 to RS34).

5    15.   On February 6, 2012, Mr. Sambold sent an email to Mr. Rudolfsky and me saying he
6  had contacted Harvey Cohen, the attorney doing the TVR work on the Ke Aloha property and asked
7  him to prepare a mortgage as security for the funds Mr. Sambold and I were being asked to advance.
8  Mr. Sambold clearly stated, "This mortgage is simply a bridge until we have a formal structure like
9  an LLC and have decided upon how the title will be held". (Appendix page RS35). Mr. Rudolfsky
10 responded that he thought that Kim Rudolfsky and he "were just going to quit claim you and Max
11 onto the house at the closing". (Appendix page RS36). Mr. Sambold responded that he did not wish
12 to transfer funds and remain unsecured until a quit claim was recorded. (Appendix page RS36).

13   16.   In February 2012, I contacted my Las Vegas attorney, John Henry Brebbia, about
14 forming an LLC in which Mr. Sambold and I expected the property to be placed after Mr. Rudolfsky
15 closed the purchase.

16   17.   On February 7, 2012, emails were exchanged agreeing that the promissory note would
17 be for $550,000 to keep the ownership at 50/50. (Appendix page RS37).

18   18.   On February 22, 2012, I sent an email to Mr. Rudolfsky and Mr. Sambold enclosing
19 a copy of a memorandum entitled "Plans for Ke Aloha," stating its purpose was to submit to the
20 attorney "so he can create an LLC agreement for us" – asking that they review it and make any
21 changes they felt were appropriate. I also indicated that on Monday I was planning to travel to Kauai
22 for a three-day visit to look at potential properties for a second purchase and was hoping Mr.
23 Rudolfsky could arrange for me to see the Ke Aloha property (Appendix pages RS37 to RS43).

24   19.   On February 23, 2012, Mr. Sambold responded by email to me and Mr. Rudolfsky
25 indicating that the "Plans for Ke Aloha" memorandum "Looks OK to me" and asking Mr. Rudolfsky

ELIZABETH J. FOLEY
LAWYER, LTD.
601 S. Rancho Drive, Suite A-1
Quail Park II
Las Vegas Nevada 89106
Phone: (702) 363-2323 • Fax: (702) 380-4035

- 5 -

if he was in general agreement? (Appendix page RS40). The same day, I sent an email to Mr. Rudolfsky and Mr. Sambold asking for a quick approval to proceed with the LLC and asking for any thoughts on the name. (Appendix page RS40). Mr. Rudolfsky responded by email saying he had not had a chance to read the memorandum. (Appendix page RS40).

20. On February 25 and March 7, 2012, Mr. Rudolfsky sent emails to Mr. Sambold and me providing further information about the Ke Aloha property but making no mention of the "Plans for Ke Aloha" memorandum. (Appendix pages RS40 to RS41).

21. On March 4, 2012, Mr. Sambold sent an email to Mr. Rudolfsky indicating that neither Mr. Sambold nor I had heard anything from him regarding the proposal set forth in the memorandum. Mr. Sambold told Mr. Rudolfsky "we're not in this to simply provide a mortgage". Mr. Rudolfsky responded with an email saying he had "discussed things with Max," and that he intended to review the memorandum again in detail. It was Mr. Rudolfsky's understanding that the details of the arrangement would be worked out after the closing. He concluded by saying, "In my first reading, I was very pleased with Max's ideas and do not see much in the way of differences." (Appendix page RS44).

22. On March 5, 2012, Mr. Sambold sent an email to Mr. Rudolfsky asking why the deal could not be done now or at least a more detailed understanding reached before the closing. In it, Mr. Sambold stated, "The only reason we went with the mortgage was because we thought we didn't have any time to do it right." The reference to doing it right meant forming the Nevada LLC and assigning to it title to the Ke Aloha property. (Appendix page RS44). Mr. Rudolfsky responded by saying a closing date was imminent and that he needed "to know the money is going to be wired regardless of us reaching finality on the LLC stuff this week . . . Please inform me if you still intend to proceed as it would be devastating to Kim and I if you are reconsidering." The Kim referenced is Mr. Rudolfsky's wife. Kim Rudolfsky served as the bookkeeper for Mr. Rudolfsky's real estate interests and is listed on the deed of Ke Aloha. (Appendix page RS45).

- 6 -

23. On March 9, 2012, I sent an email to Mr. Rudolfsky complaining about his failure to reply to my "Plans for Ke Aloha" memorandum and worrying about Mr. Rudolfsky's failure to reply becoming "a stumbling block to completing the purchase and forming the business." I asked that he read the memorandum and send Mr. Sambold and me his thoughts.(Appendix page RS46).

24. On March 13, 2012, Mr. Rudolfsky sent an email to Mr. Sambold and me stating, "I have reviewed the LLC suggestions from Max and added my input as well. Kindly review my thoughts and share any opinions you have as well." Attached was a copy of the "Plans for Ke Aloha" memorandum commenting on each of the items. Mr. Rudolfsky's responses were written in red ink. In response to items "2) Form a Nevada LLC and 3) Name Glenn as Manager and Glenn, Eric and Max as members," Mr. Rudolfsky added the notation "Good." (Appendix page RS49).

25. On March 14, 2012, I wrote an email to Mr. Rudolfsky and Mr. Sambold indicating my intention to do a revised version of the "Plans for Ke Aloha" memorandum that would include everything agreed upon. (Appendix page RS56). Mr. Rudolfsky responded by saying, "Once you are ready and if it is OK, my lawyer can do the rewrite . . . You can form the LLC in Vegas but at least we will not have to pay the extra legal fees." (Appendix page RS56).

26. On March 16, 2012, Mr. Rudolfsky wrote to Mr. Sambold and me announcing a closing date of March 28, 2012 and asking, "If we are doing a cash deal do you want to do the quit claim and be added to the deed. If we decide to finance at a later date this would work to our advantage as you will already be on the deed." Mr. Sambold responded to Mr. Rudolfsky saying, "I think we would eventually quitclaim the property to the LLC but I'd like Max's opinion. Have wiring instructions. Will take care of the funding soon, well in advance of the closing date." (Appendix page RS59).

27. On March 22, 2012, Mr. Rudolfsky sent an email to Mr. Sambold and me informing us that the closing was to take place the next day and discussing the improvements he intended to oversee. (Appendix page RS57).

28. On March 30, 2012, Mr. Rudolfsky sent an email to Mr. Sambold and me saying, "We are now the proud owners of the Ke Aloha Estate." (Appendix page RS58).

29. On April 3, 2012, Mr. Rudolfsky sent a follow up email to Mr. Sambold and me discussing the prospects for renting the property and enclosing a calendar with the rental reservations blocked out. (Appendix pages RS60 to RS62).

30. On April 16, 2012, Mr. Rudolfsky sent an email containing an additional report on the condition of the property and indicating the first check in would be there on Thursday. (Appendix page RS63).

31. On May 22, 2013, Mr. Rudolfsky sent me an email asking for an update "regarding the LLC." (Appendix page RS64).

32. On May 23, 2012, I wrote to Mr. Rudolfsky and to Mr. Sambold asking them for the addresses they wanted listed within the LLC and asking if they had any name preferences for the LLC, i.e., "Ke Aloha LLC & KE Aloha Estate LLC"? (Appendix page RS64). Mr. Rudolfsky responded by saying he had no preferences as to the name and asking whether he should use his home address? (Appendix pages RS65 to RS66). Mr. Rudolfsky provided his New York home address for the Nevada LLC (Appendix page RS66).

33. On September 7, 2013, I sent an email to my attorney, John Henry Brebbia, instructing to file the Ke Aloha LLC with the Nevada Secretary of State's office in the name of Ke Aloha, listing Mr. Rudolfsky as Manager and the Members as Mr. Rudolfsky (50%), Mr. Sambold (25%) and me (25%).

34. On September 18, 2012, I sent an email to Mr. Rudolfsky informing him that, in Nevada, LLCs with foreign names, such as Ke Aloha LLC, required an English translation and asking Mr. Rudolfsky if we should submit "the loved one" as the translation? (Appendix pages RS67 to RS68).

ELIZABETH J. FOLEY
LAWYER, LTD.
601 S. Rancho Drive, Suite A-1
Quail Park II
Las Vegas Nevada 89106
Phone: (702) 363-2323 • Fax: (702) 380-4035

35. On September 19, 2012, Mr. Rudolfsky gave his approval to the English translation of the proposed LLC name. (Appendix pages RS67 to RS68). On the same date, the LLC Articles of Organization were filed with the Nevada Secretary of State's office.

36. On September 28, 2012, Mr. Rudolfsky mailed me information regarding my 25% share of Ke Aloha from New York to Las Vegas. (Appendix page RS69; Appendix page RS81).

37. The 2013 Ke Aloha Shareholders Reports sent to me in Las Vegas from New York are contained in Appendix pages RS83-RS94.

38. Our problems with Mr. Rudolfsky over the ownership of the property surfaced in March 2014, when Mr. Rudolfsky announced his unilateral decision to pay his wife a bonus out of the Ke Aloha funds and to raise his management fee from the agreed upon 20% to 25%. Despite the six month term mortgage and promissory note having been in default for approximately eighteen months, Mr. Rudolfsky chose not to tender the lump sum payment of principal and interest. Nor did he ever mention that the mortgage and promissory note were in default. Based on the series of quarterly profit distributions and the Quarterly Reports that Mr. Sambold rendered in connection therewith evidencing the fact that the returns from the Ke Aloha property exceeded the expectation of all of us, Mr. Sambold and I were operating on the assumption that we were 50% owners of the Ke Aloha investment property. Not until March 2014, did Mr. Rudolfsky ever suggest the latter circumstance was not the case.

39. On March 18, 2014 Mr. Sambold sent an email to Mr. Rudolfsky commenting on the check and quarterly report he had received that day. Mr. Rudolfsky objected to the payment being characterized as "towards the note" and that he was "current with the rate of interest and not in default," and that as a result of this language he could not accept the check. Mr. Sambold also stated, "Given these new developments (referring to the aforesaid quarterly report language and the bonus payment to Mr. Rudolfsky's wife and Mr. Rudolfsky's decision to unilaterally raise the management fee from 20% to 25%) we need to immediately move forward to clarify the ownership in Ke Aloha

ELIZABETH J. FOLEY
LAWYER, LTD.
601 S. Rancho Drive, Suite A-1
Quail Park II
Las Vegas Nevada 89106
Phone: (702) 363-2323 • Fax: (702) 380-4035

1  through an LLC or changing the deed to include the names of ALL owners and have a clear
2  agreement in place." (Appendix pages RS95 to RS96).

3  40. Mr. Rudolfsky has resisted the plaintiffs' every attempt at honoring the agreement pursuant to which plaintiffs were induced to invest $550,000 in the Ke Aloha investment property deal by having their names added to the deed to the property as originally promised or the property conveyed to the Nevada LLC. Moreover, Mr. Rudolfsky has continued maintain the Ke Aloha funds in his own bank account and has refused plaintiffs' demand for an accounting, thus leaving plaintiffs with no recourse other than to file this lawsuit.

41. I invested $275,000, which was used by the Defendants to purchase the "Ke Aloha" property which is titled in the Defendant's names. The Defendants represented to me that I would own 25% of the Ke Aloha property. The Defendants have failed and refused to pay me my 25% share of the profits from Ke Aloha Rentals. I would respectfully request that this Nevada Court assert its jurisdictions over the Rudolfskys. It is much less convenient for all of the parties to litigate this Case in Hawaii Federal Court. All parties would be required to travel to Honolulu for Court proceedings and trial. There are no witnesses in Honolulu.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___28___ day of August, 2014.

_____
James "Max" Ruhlmann

Subscribed and sworn to me on this
_28_ day of August, 2014.

_____
NOTARY PUBLIC



DEBRA SKILLIN
Notary Public State of Nevada
No. 13-11985-1
My Appt. Exp. Nov. 11, 2017

ELIZABETH J. FOLEY
LAWYER, LTD.
601 S. Rancho Drive, Suite A-1
Quail Park II
Las Vegas Nevada 89106
Phone: (702) 363-2323 • Fax: (702) 380-4035